

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 12, 2025

**By ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Micheal Pena*, 25 Cr. 249 (DLC)

Dear Judge Cote,

    The Government respectfully submits this letter in advance of the December 17, 2025 sentencing of Micheal Pena. For the reasons set forth below, a sentence within the parties' stipulated Guidelines range (121 to 151 months' imprisonment) is necessary and appropriate in this case.

    **1. The Offense Conduct**

        **A. The Check Scheme**

    This case involves a nationwide scheme to sell and fraudulently deposit stolen checks at various financial institutions. (PSR ¶ 10.) Before such checks were deposited, they were "washed," which is a process by which the payee's information on the check is replaced with that of an account controlled by individuals participating in the scheme. (*Id*.) Often, the amount on the check would be revised as well to maximize the amount to be stolen. (*Id*.)

    Micheal Pena, the leader of the scheme, operated and used a channel on a particular messaging platform, which went by the moniker "White House Vibez," to sell checks that had been stolen from the United States Postal Service. (PSR ¶ 10.) From approximately April 2023 to October 2024, thousands of stolen checks worth more than $53 million were posted for sale on White House Vibez and the channel had thousands of subscribers. (*Id*.) The checks appeared to belong to individuals located in several states, including New York, New Jersey, Pennsylvania, Maryland, Florida, and Texas. (PSR ¶ 13.) On occasion, the perpetrators also offered for sale personal identifying information of the payors of the stolen checks, which may have been used to identify the amount of funds available in a payor's bank account and therefore, the maximum that could be stolen from the payor. (*Id*.)

    On White House Vibez, purchasers of checks were directed to send payment to various accounts on a mobile payment platform. (PSR ¶ 14.) Typically, the perpetrators would utilize a

particular account until it was shut down by the payment platform. The participants in the scheme would then open a new account and notify the subscribers of White House Vibez. (*Id.*) This happened repeatedly. In total, these accounts received more than $750,000 during the scheme. (PSR ¶ 16.)

The defendants also deposited certain of the stolen, fraudulently altered checks at various financial institutions, after which Pena bragged to subscribers about their success. Pena would often post receipts of such deposits and of cash withdrawals on White House Vibez, in an apparent attempt, at least in part, to attract customers and convey the ease with which they could make money as part of the scheme. (PSR ¶ 15.) Below is an example of such a post from June 14, 2024.



Each of the defendants played a particular role in executing the scheme:

- Pena was the leader of the scheme and ultimate beneficiary of much of the proceeds of the bank fraud conspiracy. Pena sourced the stolen checks and operated White House Vibez. (PSR ¶ 43.)

- Joshua Gutierrez, Harrington Delahoz, and Jaysen Dorsey were hired by Pena to deposit stolen, altered checks, the results of which were often posted on White House Vibez. (PSR ¶ 44.)

- Gutierrez and Delahoz also opened payment platform accounts that were utilized to collect and transfer proceeds from the scheme. Such accounts were among those posted on White House Vibez and where customers would send payments for purchased checks. (PSR ¶ 45.)

### B. Pena's Role in the Scheme

Pena was the leader and primary beneficiary of the scheme. Pena ran the "White House Vibez" channel. (PSR ¶ 18.) He posted stolen checks for sale and directed customers to contact him to purchase these checks. (PSR ¶ 13.) Pena even offered to teach subscribers how to execute the scheme – *i.e.*, how to make money by depositing fraudulent checks at banks. Below are screenshots of a post on White House Vibez from June 21, 2024, directing subscribers to contact Pena for this information.




Following these instructions, on June 27, 2024, law enforcement, using an undercover account, contacted Pena and purchased a stolen check for approximately $225. (PSR ¶ 17.)

Pena and his codefendants also deposited fraudulent checks as part of the scheme. The defendants typically traveled to banks as a group in Pena's vehicle. (PSR ¶¶ 33-34.) Upon arriving at a bank, Pena would often stay in the car, while one of the defendants would enter the bank, deposit a check, and then leave the bank just minutes later. At approximately the same time, receipts of such deposits would be posted to White House Vibez or Pena's personal account on the messaging platform. (PSR ¶¶ 32-36.)

Pena significantly profited from the scheme. As noted, over $750,000 was sent to accounts to which Pena directed customers to send payment for the stolen checks. Of this amount, the Government has traced at least $400,037.13 to accounts controlled by Pena or his loved ones.

## 2. The Plea, Guidelines Calculation, and Relative Culpability

On September 11, 2025, pursuant to a plea agreement, Pena pled guilty to Count One of the Indictment, which charges him with bank fraud conspiracy, in violation of 18 U.S.C. § 1349. In Pena's plea agreement, the parties stipulated to a Guidelines range of 121 to 151 months' imprisonment based on an offense level of 32 and a criminal history category of I. The Probation Office reaches a different Guidelines range, 151 to 188 months, which is attributable to a difference in Pena's criminal history category assessment. (PSR ¶ 114.) Specifically, Probation determined that Pena has a criminal history category of III, due to a youthful offender adjudication that Probation has determined qualifies as an adult conviction, and which results in an additional three criminal history points.

All three of Pena's codefendants have also pled guilty. In the Government's view, Pena is by far the most culpable of the four convicted defendants, followed by Gutierrez and Delahoz, and finally Dorsey. The below table summarizes the counts of conviction, stipulated Guidelines calculations, and (where applicable) the sentences imposed for the defendants.

| Defendant | Count of Conviction | Offense Level | Criminal History Category | Stipulated Guidelines Range | Sentence Imposed |
|---|---|---|---|---|---|
| Pena | 1 | 32 | I | 121–151 mos. | N/A |
| Gutierrez | 1 | 20 | III | 41–51 mos. | 41 mos. |
| Delahoz | 1 | 20 | III | 41–51 mos. | N/A |
| Dorsey | 1 | 16 | IV | 33–41 mos. | N/A |

## 3. Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

  (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B)  to afford adequate deterrence to criminal conduct;
  (C)  to protect the public from further crimes of the defendant; and
  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

  While a court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that . . . courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

  **4. The Court Should Impose a Sentence Within the Parties' Stipulated Guidelines Range**

  A sentence within the parties' stipulated Guidelines range—*i.e.*, 121 to 151 months' imprisonment—is warranted in this case given Pena's role in the scheme and the potential loss that Pena intended to cause. The Government also requests that the Court impose a term of supervised release of at least three years. Probation recommends a custodial sentence of 120 months to be followed by three years of supervised release.

  Pena, the undisputed leader of the scheme, orchestrated an extensive conspiracy to sell and deposit stolen, fraudulently altered checks at various financial institutions. Pena created a public platform (White House Vibez) on which to sell these checks and had thousands of subscribers on that platform—*i.e.*, potential coconspirators. Over approximately eighteen months, Pena posted thousands of checks for sale with a face value of more than $53 million.

  In addition to selling the stolen checks, Pena offered to teach subscribers exactly what to do to execute the scheme and dupe various financial institutions into letting them deposit and withdraw the stolen funds. Pena further offered to sell personal identifying information of the payor victims, whose checks had been stolen and fraudulently altered. With this information, purchasers of the stolen checks could access bank records for the payors to determine the amount of money available in their accounts, and in turn, the maximum amount they could list on the "washed" checks; that is, the maximum amount they could steal.

  Pena also demonstrated to his subscribers that his scheme worked. He and his codefendants deposited dozens of checks worth hundreds of thousands of dollars at several financial institutions

and then posted evidence of their success on White House Vibez, including their withdrawal of stolen funds. (PSR ¶¶ 15, 26, 28, 30, 32-36.) Pena brazenly flaunted his success, with little regard for the potential impact on the banks and individuals who were victimized by his scheme. And Pena was incredibly successful. As described above, the accounts that collected the proceeds of the scheme received more than $750,000 over an approximately 18-month period, of which at least approximately $400,000 was sent to accounts controlled by Pena or his loved ones.

The defense argues that the intended loss amount ($53 million) grossly overstates the seriousness of the offense, because it does not represent the actual amount of money gained or lost as a result of the fraud, but rather the face value of the checks posted on White House Vibez. To the contrary, the intended loss amount should be a significant factor in the Court's assessment of the severity of the defendant's conduct. This figure represents what Pena was trying to accomplish; what, if his scheme had been permitted to continue, he may have been able to accomplish. Regardless of whether all the checks posted on White House Vibez were deposited, it was clear that the intention was for such checks to be sold, fraudulently altered, and deposited. The number of deposited checks and the actual losses suffered by the banks may reflect the impact of the scheme,[1] but the Court should consider the intended impact that Pena had in carrying this out.

It is also particularly notable that while the charged conspiracy ended in October 2024, that was due to circumstances outside of Pena's control. Specifically, as described in footnote 2 below, on or about October 17, 2024, Pena was arrested in Lowndes County, Georgia and charged with identity fraud and financial card theft. Pena was released pending further proceedings, but incident to this arrest, law enforcement seized two cellphones, including the cellphone that was used to operate White House Vibez. (PSR ¶ 21.) After Pena's arrest, there were no more posts on White House Vibez, presumably because Pena no longer had access to the platform. There is no reason to believe that absent his arrest, his scheme would not have continued.

Finally, this is not the first time that Pena has engaged in financial fraud. Pena's criminal history, while relatively limited, does include a prior conviction for remarkably similar conduct. On March 3, 2022, Pena attempted to cash a fraudulent check at a bank in New Jersey. (PSR ¶ 68.) When law enforcement spoke to the company to which the check belonged, the owner stated that the check had been sent in the mail the previous month. (*Id.*) Pena was convicted of uttering a forged document and, on August 12, 2022, was sentenced to one year of probation and a $155 fine. (*Id.*) Pena benefitted from a lenient sentence that did not deter him from reengaging in such conduct. In fact, it appears that Pena committed the instant offense while on probation for his forgery conviction. A significant sentence is necessary to deter the defendant and to protect the public from further financial crimes.[2]

---

[1] The Government is in the process of calculating the applicable restitution amount and will notify the Court at sentencing of its anticipated timing for submitting any proposed restitution order.

[2] Additionally, during the course of the conspiracy charged in this case, Pena was arrested twice, in May 2024 and October 2024, in connection with his possession of checks and bank cards in the names of other individuals. (PSR ¶¶ 72, 73.) While the charges in connection with the first of these arrests were dismissed, Pena has charges for identity fraud and financial transaction card theft relating to the second arrest that are still pending. (*Id.*)

A sentence within the parties' stipulated Guidelines range would adequately address the purposes of sentencing and account for any mitigating factors raised by the defense in their submission.

5. **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of between 121 and 151 months' imprisonment.[3]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Varun A. Gumaste
Assistant United States Attorney
(212) 637-1023

cc:   Marc Greenwald, Esq. (by ECF)
      Teodora Pasca, Esq. (by ECF)

---

[3] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).